UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

JACQUON M. STOKES,

                          Plaintiff,

           -against-                                          5:12-CV-1449 (LEK)

COMMISSIONER OF SOCIAL
SECURITY,

                          Defendant.
_____

## MEMORANDUM-DECISION and ORDER

## I.    INTRODUCTION

       Before the Court is an action for judicial review of the Commissioner of the Social Security

Administration's ("SSA") decision denying Plaintiff Jacquon M. Stokes's ("Plaintiff") application

for Supplemental Security Income ("SSI") benefits.  Both parties have filed briefs.  Dkt. Nos. 14

("Plaintiff's Brief"); 21 ("Defendant's Brief").  For the reasons discussed below, the Court affirms

the Commissioner's decision.

## II.   BACKGROUND

       Plaintiff was twenty-seven years old at the time his application was denied on February 10,

2010.  Dkt. No. 10-3 at 3.  He alleges disability beginning October 1, 2000, due to diabetes, heart

murmur, asthma, herniated disc, sciatic nerve conditions, and high blood pressure.  Dkt. No. 10-6 at

7.  He states that the above-mentioned illnesses and conditions resulted in back pain, lack of

mobility, frequent colds, stomach viruses, and lumbosacryl strain—a torn muscle in the lower back.

Id.  Plaintiff worked up until the date the illnesses and conditions interfered with his ability to work,

and he did not engage in work thereafter.  Id.  He was terminated from his last employment position

on September 15, 2009.  Id.  Plaintiff reports past work as a cook, cleaner, waiter, and loading dock worker.  Id. at 8.

**A. Medical History**

On April 18, 2002, Plaintiff was transported by ambulance to the Upstate Medical University Department of Emergency Medicine due to vomiting.  Dkt. No. 10-8 at 72.  While there, Plaintiff developed excruciating right upper quadrant pain which he described as a "ten out of ten."  Id. at 68.  During the examination with George J. Ang, M.D., Plaintiff was asked to stand up to stretch, but when he did, he had a syncopal episode with loss of postural tone followed by a spontaneous recovery.  Id.  On April 20, 2002, Plaintiff was discharged and started on insulin.  Id. at 70.  His discharge diagnosis included "new-onset diabetes mellitus type 2."  Id. at 68.

On May 14, 2002, Plaintiff visited Roberto E. Izquierdo, M.D., at the Joslin Diabetes Center ("Center").  Id. at 67.  Dr. Izquierdo opined that Plaintiff's medical history and physical information were consistent with type 2 diabetes mellitus.  Id.  The diagnosis also included dyslipidemia.  Id.

Four years later, on December 21, 2006, Plaintiff returned to the Center and met with Steven V. Zygmont, M.D.  Id. at 60.  Dr. Zygmont reported that Plaintiff had not followed up with any doctors for his diabetes since his first visit at the Center in 2002.  Id.  Plaintiff stated that he had run out of insulin and had not been using it for the past year.  Id.  Dr. Zygmont asked the Center's social worker to speak to Plaintiff about obtaining his medication and to help him apply for Medicaid.  Id. at 61.  Plaintiff was prescribed insulin and given supplies, such as insulin syringes, test strips, and a glucometer.  Id.  He was also instructed to follow up with a diabetes educator in one month, and to return to the clinic in four months.  Id.

On October 16, 2009, Plaintiff entered the emergency room of Crouse Hospital, complaining

2

of a possible "diabetic problem." Dkt. No. 10-7 at 108. Plaintiff was seen by Mike Kupiec, N.P.,

and "Dr. Rachfal." Id. Plaintiff reported that he had not taken insulin for over a year and in the last

year had lost over 100 pounds. Id. Plaintiff also reported experiencing lower back pain that

radiated from his lumbar area to his hips, but he was able to get up and move around without any

obvious difficulty. Id. at 108-09. Nurse Kupiec noted that the low back pain was "somewhat

consistent with sciatica." Id. Plaintiff was given Lortab for his pain, and insulin and Glucophage

for his diabetes. Id. Plaintiff did not have insurance at the time and was instructed to apply for

Medicaid. Id.

On November 25, 2009, Plaintiff was treated by Eric Morley, M.D., at the emergency

department of Upstate Medical University. Dkt. No. 10-8 at 54. Plaintiff stated that he was diabetic

and had gotten "dizzy at the top of some stairs" and fallen down, injuring himself. Id. Plaintiff

complained of pain in his lower back and hips, as well as mild abdominal pain. Id. Upon physical

examination, Plaintiff complained of pain with stress to the pelvis and mild hip tenderness

bilaterally. Id. at 54-55. CT scans of Plaintiff's neck and lumbar spine revealed mild degenerative

changes at the upper thoracic spine level, as well as anterior wedging of the first lumbar vertebra of

indeterminate age. Id. Dr. Morley's overall impression of Plaintiff's circumstances was that of a

post-fall status with lumbar strain. Id. Plaintiff was treated with Daypro, Lortab, and Flexeril, and

referred to Upstate Connect for further care. Id.

On December 30, 2009, Plaintiff visited Community General Hospital, complaining of back

pain. Dkt. No. 10-7 at 113. Irene O. Werner, M.D., noted that she reviewed Plaintiff's previous

MRI report, which showed normal results. Id. Plaintiff was treated with Valium and Percocet. Id.

Dr. Werner reported that Plaintiff was "somewhat laughing and silly," and that he was in a hurry to

leave.  Id. at 114.

On January 29, 2010, Plaintiff was referred by the Division of Disability Determination to undergo an internal medicine examination by Richard Weiskopf, M.D.  Dkt. No. 10-7 at 128. Plaintiff was referred for complaints of diabetes, heart murmur, sciatic condition, and high blood pressure.  Id.  During the exam, Plaintiff complained of back pain.  Id. at 130.  Dr. Weiskopf noted that Plaintiff exhibited no acute distress, was able to walk on heels to some degree but could not walk on toes, and was unable to squat.  Id.  Plaintiff's stance was normal.  Id.  He did not need any assistive devices or help changing clothes for the exam or getting on and off the exam table.  Id.  He was also able to rise from his chair without difficulty.  Id.  Plaintiff reported being able to do light cooking as well as to shower and dress himself.  Id. at 129.  He stated that his girlfriend does the cleaning, laundry, and shopping, as he is unable to do the required lifting.  Id.  Reporting on his activities of daily living ("ADL"), Plaintiff stated that he watches television, listens to the radio, and socializes with friends.  Id.  Dr. Weiskopf's musculoskeletal examination revealed "definite tenderness" over Plaintiff's right sacroiliac area.  Id. at 130.  The rest of Plaintiff's exam was normal.  Id.  Dr. Weiskopf provided a medical source statement indicating that Plaintiff had no limitation sitting, but had a mild limitation on standing and walking.  Id. at 131.  Further, Plaintiff had a moderate to severe limitation on bending, lifting, climbing, and carrying.  Id.  He had, however, good use of his hands regarding strength and fine motor activities.  Id.  Dr. Weiskopf's diagnoses included diabetes mellitus, chronic low back pain with right sciatic pain distribution, upper back pain, asthma, and a history of heart murmur.  Id.

On February 4, 2010, Plaintiff was treated at Upstate Medical University by Lauren Pipas, M.D.  Dkt. No. 10-8 at 45.  Plaintiff complained of lower back pain.  Id.  Plaintiff was given Zofran,

Lortab for pain control, and metformin for diabetes. Id. at 46. Plaintiff remained hypertensive during the examination, and reported that he should be taking a medication for hypertension, but was unsure what it was. Id. Plaintiff was strongly advised to follow up to get his diabetes and high blood pressure under control. Id.

On February 9, 2010, Plaintiff was treated by Karthikeyan Sitaraman, M.D., at Upstate University Hospital. Dkt. No. 10-8 at 47. Plaintiff reported chest pain, syncope, and back pain. Id. The previous morning, Plaintiff had begun experiencing severe back pain; as he could not sleep due to the pain, he began pacing around his room, at which point he experienced sharp chest pain. Id. Afterward, he felt lightheaded and found himself falling to the floor. Id. Plaintiff reported that he had not visited a primary care physician for approximately one year, had not received any regular physician follow up for his diabetes, and was not taking any medication to control his hypertension. Id. at 47-48. Plaintiff was prescribed Lisinopril for his blood pressure and a Lidoderm patch for his back pain. Id. at 49.

On February 11, 2010, Plaintiff was seen by Antonio Culebras, M.D., at Upstate Medical University for an evaluation of Plaintiff's back pain. Id. at 29. Dr. Culebras noted that a recent MRI of the lumbosacral spine without contrast did not demonstrate any cauda equina syndrome, radiculopathy, or myelopathy. Id. at 30. Dr. Culebras noted that there was no objective evidence of any neurological deficit with regards to Plaintiff's back pain. Id. He noted that the intractable back pain was most likely of musculoskeletal etiology or due to neuropathy, but without any objective findings, Dr. Culebras found this very unlikely. Id. Symptomatic management was recommended, with either Lyrica or gabapentin. Id. In addition, Plaintiff's urinalysis test was positive for cocaine, opioids, benzodiazepines, and cannabinoids. Id.

On March 10, 2010, Plaintiff was treated for high blood pressure by Anthony M. DiRubbo, M.D., at Upstate Medical University. Id. at 19. Plaintiff also reported having a severe headache and back pain. Id. Plaintiff reported that gabapentin was not helping his pain, which he described as a "ten out of ten." Id. Plaintiff was admitted to the hospital for observation and management of his hypertension, and was discharged on March 11, 2010. Id. at 16, 20. His discharge diagnoses by Peter J. Conkright, M.D., included hypertensive urgency and diabetes mellitus. Id.

On June 7, 2010, Plaintiff was seen by Dr. Zygmont for a follow-up visit at the Joslin Diabetes Center. Id. at 12. During this visit, Dr. Zygmont noted that Plaintiff's intractable back pain caused him to be unable to sit through the exam. Id. at 13. Dr. Zygmont noted that Plaintiff ran out of Naprosyn, stopped taking Protonix, lost his glucometer, and did not follow up with the department of Neurology at the University Hospital. Id. at 12. Plaintiff also failed to take his hypertension medication the day of the appointment. Id. at 13. Dr. Zygmont refilled Plaintiff's prescriptions of Naprosyn and Protonix, and gave Plaintiff a prescription for thirty tablets of hydrocodone APAP to help relieve some of his pain until it could be investigated further. Id.

On June 12, 2010, Plaintiff visited Jay M. Brenner, M.D., at Upstate Medical University's Emergency Department complaining of back pain. Id. at 7. Plaintiff compared the pain to being poked with hot needles. Id. Dr. Brenner noted that on examination, Plaintiff was tender to palpation of the thoracic and lumbar spinous processes, beginning at the level of T9-T10 and extending all the way down through his lumbar spine. Id. at 8. Dr. Brenner noted that the most likely diagnosis was some form of sciatica that had recently been exacerbated. Id. at 9. Plaintiff was prescribed Lortab and Valium. Id.

On July 13, 2010, Plaintiff was evaluated by Aaron M. Dombeck, M.S.P.T. ("Dombeck"), at

6

Community General Physical Therapy ("CGPT").  Id. at 92.  On examination, Plaintiff's posture was noted to be fair, and he had a loss of lumbar range of motion of 85% in flexion, 40% in extension, 75% in rotation to both the left and right side, and 80% in left side bending.  Id. Dombeck planned to see Plaintiff two to three times per week for the next four weeks for treatments, including ultrasound, range of motion exercises, traction, McKenzie exercises, postural education, trunk strengthening, electronic stimulation, and ice.  Id. at 93.

On July 28, 2010, Plaintiff was treated at CGPT by Vicki Overend, P.T.A. ("Overend").  Id. at 91.  Plaintiff's lumbar range of motion was limited to 50% in flexion, and straight leg raise ("SLR") tests were positive bilaterally.[1]  Id.  According to Overend, Plaintiff's functional limitations prevented him from doing any activities without significant pain.  Id.  Pain medications and mechanical traction provided minimal, temporary pain reduction.  Id.

On August 18, 2010, Plaintiff was treated at Upstate Comprehensive Pain Medicine by P. Sebastian Thomas, M.D., and Jasbir Dahliwal, M.D.  Id. at 85.  Plaintiff reported a history of chronic middle and lower back pain associated with bilateral lower extremity numbness and tingling.  Id.  Plaintiff stated that he had started having anterior right thigh pain radiating down to his toes in the past year.  Id.  He reported that his back pain had started as lower back pain and progressed to the middle back.  Id.  Plaintiff reported trying physical therapy in the past with no relief.  Id.  A musculoskeletal examination revealed a limited range of motion of the lumbar spine in all planes and tenderness to palpation of the midline upper and lower lumbar spine and the right sacroiliac ("SI") joint.  Id. at 86.  Dr. Dhaliwal assessed the lumbar disc degeneration as deteriorated; lumbar/thoracic radiculopathy as deteriorated; facet arthropathy as deteriorated; and

---

[1] The SLR test is positive if pain occurs within a certain range.  Dkt. No. 10-2 at 24.

diabetic neuropathy as unchanged.  Id. at 87.  Plaintiff was prescribed Methadone and Amitriptyline.
Id.

On August 30, 2010, Plaintiff was treated at CGPT by Overend.  Id. at 90.  Plaintiff
complained of upper and lower back pain and pain in both legs.  Id.  Plaintiff's functional
limitations were described as: ambulation tolerance of about five minutes; some increased activity
with pain medication, although its effectiveness had faded over the preceding few days; sitting
tolerance of ten to fifteen minutes; and difficulty with stairs (one step at a time).  Id.  It was noted
that, while Plaintiff's sleep had improved with medication, he was still waking up six times per
night.  Id.  Continued physical therapy was recommended.  Id.

On October 13, 2010, Plaintiff was again treated at CGTP by Overend.  Id. at 89.  Plaintiff's
lumbar spinal range of motion was noted as 25% in flexion and extension.  Id.  SLR tests were
positive in both legs at 45 degrees and tests for SI instability were also positive.  Id.  Plaintiff's
functional limitations were described as "difficulties with all ADL's (bending, lifting), very antalgic
gait pattern, [and] only sleeping with [medication]."  Id.

On October 14, 2010, Plaintiff was treated at Upstate Comprehensive Pain Medicine by
Phyllis Bazen, NP.  Id. at 79.  It was noted that Plaintiff's pain had improved slightly with
medication and that he was sleeping better with Cymbalta and Amitriptyline.  Id.  Plaintiff described
the pain as, at worst, "an eight on a scale of ten," and "at least, a two."  Id.  At the time, he rated his
pain at four.  Id.  It was reported that the pain did not prevent Plaintiff from taking part in social and
recreational activities.  Id.  It was also noted that Plaintiff sleeps eight hours in a 24-hour period.
Plaintiff was continued on methadone, Cymbalta, and Amitriptyline.  Id. at 81.

On November 3, 2010, Plaintiff's treating physical therapists, Dombeck and Overend,

completed a medical source statement.  Id. at 94-96.  They noted that they had treated Plaintiff one

to two times per week since July 31, 2010.  Id. at 94.  Plaintiff's prognosis at that time was poor to

fair.  Id.  They also opined that if Plaintiff were placed in a competitive work situation, he could

walk zero city blocks without pain; sit for ten to fifteen minutes at a time before needing to get up;

and stand for zero to five minutes before needing to sit down or walk around.  Id.  They further

stated that in an eight-hour workday, Plaintiff could sit for about two hours total and stand for less

than two hours total.  Id.  They also concluded that Plaintiff needed a job that allows him to: shift

positions at will; take unscheduled breaks several times per hour, with ten to thirty minutes or more

of rest before returning to work; elevate his legs with prolonged sitting; and lie down frequently to

relieve severe symptoms.  Id.  Dombeck and Overend also stated that Plaintiff could: never lift

twenty pounds, rarely lift ten pounds and occasionally lift less than ten pounds; twist occasionally;

stoop/bend rarely; never crouch/squat; never climb ladders; rarely climb stairs; and occasionally

reach overhead.  Id. at 95.  They concluded that Plaintiff would be unable to maintain attention or

perform at a consistent pace for more than 20% of an eight-hour workday, was likely to have good

and bad days, and would miss more than four days of work each month.  Id.  Finally, they noted that

extreme drops in temperature increase Plaintiff's symptoms.  Id. at 96.

**B.  The Disability Examiner's Opinion**

On February 5, 2010, disability examiner E. Amata completed a Residual Functional

Capacity ("RFC") assessment of Plaintiff and reported that Plaintiff could occasionally lift twenty

pounds, frequently lift ten pounds, stand and/or walk for a total of about six hours in an eight-hour

workday, sit for about six hours in an eight-hour workday, and that his abilities to push or pull were

unlimited.  Dkt. No. 10-7 at 134.  The examiner stated that Plaintiff could occasionally climb,

9

balance, stoop, kneel, crouch, and crawl. Id. at 135. The examiner found Plaintiff's complaints of

constant pain in his low back, legs, and hips partially credible. Id. The examiner also stated that Dr.

Weiskopf's opinion that Plaintiff had moderate to severe limitations on bending, lifting, climbing,

and carrying is not consistent with the evidence in the file. Id. An MRI performed on November

18, 2009, found no abnormality of Plaintiff's lumbar spine. Id. Lastly, the examiner concluded that

Plaintiff retains the ability to perform light work. Id. at 138.

### C. Procedural History

On October 29, 2009, Plaintiff protectively filed an application for SSI, alleging disability

beginning October 1, 2000. Pl. Br. at 3; but see Dkt. No. 10-5 at 2 (stating that the date of the

application is November 19, 2009). The claim was denied on February 10, 2010. Dkt. No. 10-3 at

2-3. Thereafter, on April 7, 2010, Plaintiff filed a written request for a hearing, Dkt. No. 10-4 at 9-

10, and on November 5, 2010, appeared and testified at a hearing before the Administrative Law

Judge ("ALJ") Bruce S. Fein, Dkt. No. 10-2 at 17-27. The ALJ found that Plaintiff was not

disabled. Id. at 26. The ALJ's decision became the final decision of the Commissioner when the

Appeals Council denied Plaintiff's request for review on July 24, 2012. Id. at 2-4. This action

ensued. Dkt. No. 1 at 1-2.

### D. The ALJ's Decision

In his decision, the ALJ concluded that Plaintiff was not disabled within the meaning of the

Social Security Act ("Act"). Dkt. No 10-2 at 20. The ALJ found that Plaintiff had not engaged in

substantial gainful activity since the application date. Id. at 22. He also found that Plaintiff suffered

severe impairment from diabetes and chronic low back pain with right sciatic pain. Id. He found

that Plaintiff did not have an impairment or combination of impairments that met or medically

equaled a listed impairment.  Id.  The ALJ determined that Plaintiff had the RFC to perform "light

work," except he "[c]an lift and carry 20 pounds occasionally and 10 pounds frequently; can climb

ramps/stairs, ladders/ropes/scaffolds only occasionally; can balance, stoop, kneel, crouch, crawl only

occasionally; [and] must avoid extreme temperatures, humidity, fumes and odors."  Id.  Finally, the

ALJ determined that Plaintiff was unable to perform any past relevant work, but, considering

Plaintiff's age, education, work experience, and RFC, there were significant numbers of jobs in the

national economy that Plaintiff could perform.  Id. at 25.

## III.    LEGAL STANDARD

### A. Standard of Review

42 U.S.C. § 405(g) grants jurisdiction to district courts to hear claims based on the denial of

an SSI application.  A reviewing court may set aside a determination by the Commissioner only if it

is based upon a legal error or is not supported by substantial evidence in the record.  See 42 U.S.C.

§§ 405(g) and 1383(c)(3); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982); Dousewicz v.

Harris, 646 F.2d 771, 773 (2d Cir. 1981).  Substantial evidence is "more than a mere scintilla"; it is

"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S.

197, 229 (1938)); see also Diaz v. Shalala, 59 F.3d 307, 314 (2d Cir. 1995); Rivera v. Sullivan, 923

F.2d 964, 967 (2d Cir. 1991).

Accordingly, if there is substantial evidence in the record to support the Commissioner's factual findings, those findings are conclusive and must be upheld. See Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999); see also 42 U.S.C. § 405(g). Moreover, the reviewing court "may not substitute its own judgment for that of the [ALJ's], even if it might justifiably have reached a different result upon a de novo review." Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991) (quoting Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984)).

**B.  Standard for Benefits**

A claimant is disabled within the meaning of the Act if he or she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a). Under § 1614(a)(3) of the Act, a medically determinable physical or mental impairment is an impairment that results from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3). Further, a physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by the individual's statement of symptoms. 20 C.F.R. § 416.908.

The SSA has established a five-step sequential process for determining whether an individual is disabled. 20 C.F.R. §§ 404.1520 and 416.920. If at any step it can be determined that the claimant is or is not disabled, the SSA will not review the claim further. See Barnhart v. Thomas, 540 U.S. 20, 24 (2003). The first step serves to determine if the plaintiff is engaging in substantial gainful activity. 20 C.F.R. § 416.920(b). Step two assesses whether the plaintiff has a severe medically determinable impairment. Id. § 416.920(c). Step three determines whether the

12

plaintiff's impairment or combination of impairments meets or medically equals the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925, and 416.926). Step four assesses whether the plaintiff has the RFC to perform the requirement of his past relevant work. Id. § 416.920(f). Finally, a determination is made whether the plaintiff is able to do any other work considering the plaintiff's RFC, age, education, and work experience. Id. § 416.920(g). The plaintiff bears the burden of proof with regard to the first four steps. Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008). At the fifth step, the SSA bears the burden of demonstrating that other work exists in significant numbers in the national economy that the plaintiff can perform given the RFC, age, education, and work experience of the plaintiff. 20 C.F.R. §§ 416.912(g) and 416.960(c).

## IV.     DISCUSSION

Plaintiff contends that the ALJ's RFC finding is unsupported by substantial evidence. Pl. Br. at 16. More specifically, Plaintiff argues that the ALJ improperly afforded very little weight to the opinions of the physical therapists and too much weight to the opinions of two physicians, Dr. Werner and Dr. Brenner. Id. at 16-20. Plaintiff also contends that the ALJ erred in failing to make proper credibility findings as to Plaintiff's testimony, id. at 20, and that the ALJ's determination whether Plaintiff is able to do any other work considering Plaintiff's RFC, age, education, and work experience is unsupported by substantial evidence, id. at 23.

### A.  Residual Functional Capacity

In the five-step sequential process established by the SSA, the fourth step requires an ALJ to determine whether the claimant retains the residual functional capacity to perform his past relevant work. 20 C.F.R. §§ 404.1520 and 416.920. An individual's "residual functional capacity is the

13

most [he] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1). In order to determine a claimant's RFC, the ALJ must assess "all of the relevant medical and other evidence." Id. § 404.1545(a)(3). Also, the ALJ must consider the claimant's "ability to meet the physical, mental, sensory, and other requirements of work" "on a regular and continuing basis." Id. § 404.1545(a)(4), (b). A regular and continuing basis is defined as "8 hours a day, for five days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996).

A plaintiff's RFC is determined by examining his own statements regarding his impairments, the observations of others who are familiar with the claimant, and the observations of medical sources. See 20 C.F.R. § 416.929.

The ALJ will give controlling weight to a "treating source's opinion on the issue(s) of the nature and severity of [the] impairment(s)" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(c)(2). In order to receive controlling weight under the treating-source rule, a "treating source's opinion . . . must be a *medical* opinion. Diaz v. Shalala, 59 F.3d 307, 313 (2d Cir. 1995). The regulations provide that "[m]edical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the] impairment(s) . . . ." Id. § 404.1527(a)(2). Section 416.913(d) lists five categories of "acceptable medical sources," none of which mention physical therapists. As such, a physical therapist is not an "acceptable medical source." 20 C.F.R. § 416.913(d); Carway v. Astrue, No. 06-CV-13090, 2011 WL 924215, at *3 (S.D.N.Y. Mar. 16, 2011). The opinions of physical therapists are therefore not entitled to controlling weight, and the ALJ has discretion to determine the appropriate weight to accord them. Diaz v. Shalala, 59 F.3d 307, 313-14 (2d Cir. 1995).

14

The ALJ found that Plaintiff has the RFC to perform light work as defined in 20 C.F.R.

§ 416.967(b), except he "[c]an lift and carry 20 pounds occasionally and 10 pounds frequently; can

climb ramps/stairs, ladders/ropes/scaffolds only occasionally; can balance, stoop, kneel, crouch,

crawl only occasionally; [and] must avoid extreme temperatures, humidity, fumes and odors." Dkt.

No. 10-2 at 22. In his RFC determination, the ALJ noted that Plaintiff's medically determinable

impairments could reasonably be expected to cause the alleged symptoms, but Plaintiff's statements

concerning the intensity, persistence, and limiting effects of these symptoms were not credible. Id.

at 23. The ALJ also noted, *inter alia*, that the opinion of physical therapist Dombeck "is not fully

credible, and is assigned very little weight" and that the opinions of Dr. Brenner and Dr. Werner

"are credible and assigned substantial weight." Id. at 25.

Plaintiff argues that the ALJ erred in failing to assign appropriate weight to the opinions of

Plaintiff's physical therapists. Pl. Br. at 16. However, the ALJ properly found that the therapists'

opinions were unsupported by the record, which contained many normal and nearly normal

diagnostic and clinical findings. See, e.g., Dkt. Nos. 10-7 at 108-09, 130-31, 138; 10-8 at 55, 89-91.

Specifically, Dombeck and Overend found that Plaintiff had a loss of lumbar range of

motion, Dkt. No. 10-8 at 89, 90, 91, positive SLR tests on both sides, id. at 89-91, and positive SI

and leg length tests, id. at 90. This finding, however, is inconsistent with the record. Dr. Weiskopf

found that Plaintiff's SLR and cross-table SLR, both used to determine whether a patient with low

back pain has a herniated disk, were negative. Dkt. No. 10-7 at 131. No pain was elicited during

the examination by Dr. Weiskopf. Dkt. No. 10-7 at 131. Further, Dr. Weiskopf noted that Plaintiff

appeared in no acute distress, needed no assistive devices, and needed no help changing clothes for

the exam or getting on and off the exam table. Id. at 130. He was also able to rise from his chair

without difficulty, and his stance was normal.  Id.  This finding is consistent with the observations

of Dr. Rachfal during Plaintiff's October 2009 visit to the emergency room.  Dr. Rachfal noted that,

although Plaintiff reported experiencing low back pain that radiated from his lumbar area to his

hips, he was able to get up and move around without any obvious difficulty.  Dkt. No. 10-7 at 108-

09.

     During Plaintiff's November 2009 emergency room visit, Dr. Brenner, the attending

physician, also found that Plaintiff's SLR and cross-table SLR were negative.  Id. at 117.  In fact, x-

rays of Plaintiff's lumbar spine taken that month were normal, id. at 119, as was an MRI of

Plaintiff's lumbar spine, id. at 120.  On November 25, 2009, a CT scan of Plaintiff's lumbar spine

showed anterior wedging of the L1 vertebral body, but was otherwise unremarkable.  Dkt. No. 10-8

at 55.  A CT scan of Plaintiff's cervical spine showed a subchondral cyst at C5 and mild

degenerative changes at TI-T2, but no fractures and well-maintained body heights and disc spaces.

Id.  On February 10, 2010, x-rays of Plaintiff's pelvis showed no fractures or dislocations, and

normal sacroiliac joints.  Id. at 34.  These diagnostic findings are consistent with the record.  For

instance, although Dr. Weiskopf's musculoskeletal examination revealed "definite tenderness" over

Plaintiff's right sacroiliac area, Dkt. No. 10-7 at 130, Plaintiff's cervical spine showed full flexion,

extension, lateral flexion bilaterally, and full rotary movement bilaterally, id. at 131.  There was no

scoliosis, kyphosis, or abnormality of the thoracic spine.  Id.  Plaintiff's lumbar spine exhibited full

extension, lateral flexion, and full rotary movement bilaterally.  Id.  Plaintiff had full range of

motion in his shoulders, elbows, forearms, wrists, knees, and ankles bilaterally.  Id.  There were no

evident subluxations, contractures, ankylosis, or thickening.  Id.  The joints were stable and

nontender.  Id.  Upon a neurologic examination, Dr. Weiskopf discovered no motor or sensory

deficit. Id.

Dombeck's opinion that Plaintiff's prognosis was fair to poor, Dkt. No. 10-8 at 94, and that he would miss more than four days of work per month, id. at 95, is equally unsupported by the record and the many normal and nearly normal clinical findings contained therein. For instance, Dr. Weiskopf reported that Plaintiff had no limitation on sitting and only mild limitation on standing and walking. Dkt. No. 10-7 at 131. Dr. Weiskopf further noted that: Plaintiff had good use of his hands regarding strength and fine motor activities; Plaintiff had no motor or sensory deficit or muscle atrophy; Plaintiff's hand and finger dexterity was intact, and his grip strength was 5/5 bilaterally. Id. On February 11, 2010, Dr. Antonio Culebras, the attending physician at Upstate University Hospital evaluated Plaintiff for back pain and found normal 5/5 strength in Plaintiff s upper and lower extremities. Dkt. No. 10-8 at 31. There was normal muscle tone and bulk. Id. The SLR test was also negative. Id. Dr. Culebras stated that he found no objective evidence of any neurological deficit. Id.

Based on the foregoing substantial evidence, the ALJ reasonably found that Plaintiff could perform a range of light work. The ALJ's determination is also consistent with that of the disability examiner, who opined that Plaintiff retains the ability to perform light work. Dkt. No. 10-7 at 138.

Plaintiff concedes that a physical therapist is not an acceptable medical source pursuant to 20 C.F.R. § 416.913, but argues that, nonetheless, the opinion should have been considered under SSR 06-03p, 2006 WL 2329939, at *4-5 (Aug. 9, 2006). Pl. Br. at 17. Evidence from "other sources," such as from a physical therapist, as defined in 20 C.F.R. §§ 404.1513(d) and 416.913(d), may only be considered to show the severity of Plaintiff's impairments and how they affect Plaintiff's ability to function. SSR 06-3p. The ALJ may apply the factors in 20 C.F.R. §§ 404.1527(c) and

416.927(c) to the evaluation of opinions from physical therapists.  Id.  These factors include: how

long the source has known and how frequently the source has seen the individual; how consistent

the opinion is with other evidence; the degree to which the source presents relevant evidence to

support an opinion; how well the source explains the opinion; whether the source has a specialty or

area of expertise related to the individual's impairment, and any other factors that tend to support or

refute the opinion.[2]  20 C.F.R. §§ 404.1527(c) and 416.927(c).

    At the time they made their findings, PTs Dombeck and Overend noted that they had treated

Plaintiff one to two times per week for approximately three months.  Dkt. No. 10-8 at 94.  While the

length of the treatment relationship is an important factor to consider in evaluating opinion

evidence, see 20 C.F.R. § 416.927, other criteria support the ALJ's determination of placing little

weight on Dombeck and Overend's opinions.  The PTs were not familiar with other medical

information in Plaintiff's record, nor are they specialists in determining the impact of functional

limitations on work performance.[3]  The PTs' opinion is not supported with any relevant evidence in

_____

[2] Further, the weight to be accorded a medical source opinion of any sort is determined based
on: (1) the examining relationship—more weight is given to the opinion of a source who has
examined the claimant than to the opinion of a source who has not; (2) the treatment
relationship—more weight is given to treating sources; (3) supportability—more weight is given if
the medical source supports his opinion with relevant evidence in the record, particularly medical
signs and laboratory findings, or provides a good explanation for his opinion; (4)
consistency—more weight is given the more consistent an opinion is with the record as a whole; (5)
specialization—more weight is given to the opinion of a specialist about medical issues related to
his or her area of specialty than to the opinion of a source who is not a specialist; (6) other
factors—weight may be accorded based on any other factors that tend to support or contradict the
opinion.  20 C.F.R. § 404.1527(c).
[3] The Medical Source Statement, Dkt. No. 10-8 at 96, is the crucial piece of evidence
supporting Plaintiff's claims of disability.  Although the Statement is to be filled out by a nurse
practitioner or social worker, id., in this case, it was filled out by Overend, who is not even a
physical therapist but only a physical therapist assistant.  Further, the Medical Source Statement
asks for a "Supervising Physician's Signature" at the bottom of the document.  In this case, the
signatory is Dombeck, who is not a physician.  Id.

the record, such as imaging tests or laboratory findings, nor do the PTs provide a good explanation for their opinion. As already explained, less weight should be given when the opinion is not consistent with the record as a whole, as is the case here. Finally, Plaintiff's lack of credibility, discussed *infra*, also tends to refute the PTs' opinion.

The PTs' findings cannot outweigh the entire record, which does not support their conclusions. Plaintiff would like to see the PTs' findings as near-dispositive, but the ALJ has discretion to determine the appropriate weight to accord these opinions. Here, the ALJ properly found that the PTs' opinions were unsupported by the record. As previously discussed, the record contained many normal and nearly normal clinical and diagnostic findings by multiple physicians. The ALJ had discretion to decide what weight, if any, the PTs' opinion deserved in the circumstances presented. The ALJ ultimately afforded little weight to their opinion because he found it to be "not fully credible."

Plaintiff further argues that the ALJ erred in affording substantial weight to the opinions of Dr. Brenner and Dr. Werner, because these doctors did not express opinions about Plaintiff's functional limitations. Pl. Br. at 18-20. Dr. Brenner, both on November 2009 and June 2010, included in his medical report an entire section entitled "History of Present Illness," which is a complete review of symptoms focused on Plaintiff's complaints of back pain. Dkt. Nos. 10-7 at 117; 10-8 at 7. This section encompasses an evaluation of a patient's pain complaint and includes pain onset, known triggers, duration, location, severity, other associated symptoms, and what exacerbates and what relieves the pain. For instance, Plaintiff denied change in coordination or gait, reported that Neurontin was helpful in relieving symptoms, and that pain was so severe at times that it caused nausea but no vomiting. Dkt. No. 10-8 at 7-9. Dr. Werner's "History of Present Illness"

19

also reviews the quality, chronicity, and history of the symptoms.  Dkt. No. 10-7 at 113.

Dr. Brenner, both on November 2009 and June 2010, also assessed Plaintiff's physical capabilities, Dkt. Nos. 10-7 at 117; 10-8 at 9, and found Plaintiff's quadriceps, hamstrings and muscles with dorsi and plantar flexion strength to be 5/5 symmetric bilaterally, which is normal, even though Plaintiff complained of feeling weak.  Dkt. No. 10-8 at 8.  The "Emergency Department Course" section lists and reviews "the differential diagnosis," showing the process by which the doctor arrived at his assessment.  Dkt. Nos. 10-7 at 117; 10-8 at 8.

Similarly, Dr. Werner described Plaintiff's physical capabilities, including that Plaintiff's sensation was intact in his lower extremities, and that he moved his extremities well.  Dkt. No. 10-7 at 114.  Dr. Werner also included a differential diagnosis and stated that after receiving his narcotic medication, Plaintiff "was feeling better," "was in a hurry to go," and "was somewhat laughing and silly."  Id.  Dr. Werner found Plaintiff gone when she returned to review the diagnostic test results with him.  Id.  Also, Dr. Brenner's evaluation in November 2009 included lumbar spine x-rays and an MRI, both of which were normal, and a physical examination which revealed a normal gait, normal reflexes, no motor deficits, and a negative SLR test.  Id. at 117.

In sum, both Dr. Werner's and Dr. Brenner's opinions include a review of symptoms, diagnoses, and treatment, and provide medical documentation that could serve in assessing Plaintiff's functional abilities.  Furthermore, the records are consistent with the reports of other physicians, such as Dr. Weiskopf.  As previously stated, it is in the ALJ's discretion to assign weight to medical opinions, and his decision should not be disrupted.

**B. Credibility**

Plaintiff claims that the ALJ erred in his evaluation of Plaintiff's credibility and subjective complaints of pain. Pl. Br. at 20. In his decision, the ALJ determined that Plaintiff's subjective complaints were not credible. Dkt. No. 10-2 at 23.

An ALJ's credibility findings are entitled to deference by a reviewing court. See Tejada v. Apfel, 167 F.3d 770, 775-76 (2d Cir. 1999). The ALJ is uniquely situated to assess witness credibility; it is within the Commissioner's discretion to evaluate the credibility of Plaintiff's testimony and a reviewing court should not upset the ALJ's findings regarding the true extent of impairment where there is sufficient evidence to support them. Mimms v. Secretary, 750 F.2d 180, 186 (2d Cir. 1984); Gernavage v. Shalala, 882 F. Supp. 1413, 1419 (S.D.N.Y. 1995). "[T]he ALJ is required to take the claimant's reports of pain and other limitations into account, but is not required to accept . . . subjective complaints without question . . . [and] may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010).

Generally, "[w]here the evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld." Knighton v. Astrue, 861 F. Supp. 2d 59, 63 (N.D.N.Y. 2012). "It is the function of the Commissioner, not the reviewing courts, to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." Tarsia v. Astrue, 418 F. App'x 16, 19 (2d Cir. 2011) (internal quotation marks and alterations omitted). "It is also true that [courts] show special deference to credibility determinations made by the ALJ, who had the opportunity to observe the witnesses' demeanor." Id. (internal quotation

marks omitted); see also Selian v. Astrue 708 F.3d 409, 420 (2d Cir. 2013) ("[A]n ALJ's credibility determination is generally entitled to deference on appeal.").

Here, substantial evidence supports the ALJ's finding that Plaintiff's statements "concerning the intensity, persistence[,] and limiting effects of these symptoms" were not credible. Dkt. No. 10-2 at 23. The record reveals many contradictions that can be illustrated with a few examples.

First, Plaintiff reported on November 25, 2009, to Dr. Eric Morley at the emergency department of Upstate Medical University that he had fallen down and injured himself, causing lower back pain. Dkt. No. 10-8 at 54. However, during a medical assessment by Dr. Jay Brenner in June 2010, Plaintiff denied any history of trauma to his back, or falls, and was unable to name any specific event as the aggravating or instigating factor for his back pain. Id. at 7.

Second, during a consultative exam with Dr. Weiskopf, in January 2010, the records show that Plaintiff denied using alcohol or street drugs. Dkt. No. 10-7 at 129. Plaintiff also reported no alcohol or recreational drug use to Dr. Sitaraman in February 2010. Dkt. No. 10-8 at 48. At the hearing before the ALJ, however, Plaintiff testified that he served time in jail for possession of marijuana and that he had used cocaine in the past. Dkt. No. 10-2 at 57, 60-61. In addition, the record indicates that Plaintiff had used ecstasy, which Plaintiff failed to mention during the hearing. Dkt. No. 10-8 at 30.

Third, in a written statement dated January 18, 2010, Plaintiff stated that he did not socialize or go outside due to his pain, and that he did not like having people around him. Dkt. No. 10-6 at 45. However, as the ALJ noted, in the same month, Plaintiff told Dr. Weiskopf that he socialized with friends. Dkt. No. 10-7 at 129.

Fourth, Plaintiff reported losing 300 pounds in six months to Dr. Sitaraman during his visit to the Upstate University Hospital in February 2010. Dkt. No. 10-8 at 48. During testimony before the ALJ in November of that same year, he testified that he lost about 200 pounds in a year and a half. Dkt. No. 10-2 at 59. During his exam with Dr. Weiskopf, he reported that he lost only 126 pounds. Dkt. No. 10-7 at 129. During that exam he also claimed that he had previously weighed 300 pounds, id., but only five months later in June 2010, during a consultation with Dr. Zygmont at the Joslin Diabetes Center, Plaintiff claimed he had previously weighed 500 pounds. Dkt. No. 10-8 at 12.

Fifth, Plaintiff testified before the ALJ that the reason for the weight loss was "sugar. . . eating fat cells in [Plaintiff's] body." 10-2 at 59. However, he attributed his weight loss to improved nutrition during his consultative exam with Dr. Weiskopf. Dkt. No. 10-7 at 129.

Further, during a consultation with Dr. Antonio Culbera at Upstate University Hospital in February 2010, Plaintiff reported being incarcerated for twenty-four months. Dkt. No. 10-8 at 30. During the hearing he stated that he was incarcerated for twelve months. Dkt. No. 10-2 at 61.

Next, plaintiff denied alcohol use on January 29, 2010, during an examination by Dr. Weiskopf, Dkt. No. 10-7 at 128, but six days later reported occasional alcohol use during a medical examination by Dr. Lauren Pipas on February 4, 2010, Dkt. No. 10-8 at 45. He also testified that he does not use alcohol at the hearing in November of that same year. Dkt. No. 10-2 at 57.

Additionally, during the November testimony, Plaintiff reported that his fiancée did everything in the house and that he did not do any of the housework or cooking, Dkt. No. 10-2 at 56, but reported to Dr.Weiskopf that he did light cooking, Dkt. No. 10-7 at 129.

Lastly, in June 2010, during an examination by Dr. Brenner, Plaintiff stated that he had been

23

"thoroughly worked up for [the back pain] multiple times," which is unsupported by the record; no such work up had been performed. Dkt. No. 10-8 at 7.

The ALJ found that many of these contradictions damaged Plaintiff's credibility, Dkt. No. 10-2 at 23-24, and the Court agrees. In his decision, the ALJ correctly determined that Plaintiff's statements "concerning the intensity, persistence[,] and limiting effects of these symptoms [were] not credible. . . ." Dkt. No. 10-2 at 23. The ALJ carefully considered all of Plaintiff's subjective complaints concerning his physical limitations, giving reasons why he believed they were not entitled to great weight, and such findings are supported by substantial evidence in the record as illustrated above. See Dkt. No. 10-2 at 22-25. Consequently, there is no basis to disturb these findings.

Plaintiff next argues that the ALJ failed to consider all of the factors listed in 20 C.F.R. § 416.929(c)(1) in assessing his credibility. Pl. Br. at 21. When a medically determinable impairment exists, objective medical evidence must be considered in determining whether disability exists, whenever such evidence is available. 20 C.F.R. § 416.929(c)(2). If the claimant's symptoms suggest a greater restriction of function than can be demonstrated by objective medical evidence alone, consideration is given to such factors as the claimant's daily activities; the location, duration, frequency and intensity of pain; precipitating and aggravating factors; the type, dosage, effectiveness and adverse side-effects of medication; and any treatment or other measures used to relieve pain. 20 C.F.R. § 416.929(c)(3); see SSR 96-7p.

Here, the ALJ considered treatment records from September and October 2010, which indicate that Plaintiff's pain had improved with medication and physical therapy. Dkt. No. 10-2 at 23. The ALJ also noted that Plaintiff reported in January 18, 2010, that he did not socialize or go

24

outside due to his pain, and that he did not like having people around him; yet, the same month, Plaintiff told Dr. Weiskopf that he socialized with friends. Id. at 24. The ALJ also noted that Plaintiff denied any history of using street drugs to Dr. Weiskopf. Plaintiff testified, however, that he served time in jail for possession of marijuana, and that he tried self-medicating with cocaine. Id.

The ALJ is also permitted to consider whether a claimant has refused a prescribed treatment in determining disability, 20 C.F.R. § 416.930(b), and whether there is an "acceptable reason for failure to follow prescribed treatment," id. § 416.930(c). Here, the ALJ noted that "while [Plaintiff] has had scheduled appointments for medical treatment, he has repeatedly failed to appear for them." Id. at 25. Although Plaintiff asserted that he did not take diabetes medication for two years "due to a lack of insurance," the ALJ found that "none [of the records] show that [Plaintiff] ever tried to resolve this alleged problem." Id. at 23. Plaintiff argues that he did not appear for his appointments because he lacked insurance and could not afford them, Pl. Br. at 21, yet Plaintiff began diabetic treatment at the Joslin Diabetes Center without insurance, Dkt. No. 10-8 at 61. Without regard to Plaintiff's insurance status, Plaintiff was started on Humulin and received supplies such as insulin syringes, test strips, and a glucometer. Id. There is no evidence in the record indicating that Plaintiff ever returned to the clinic. In fact, between 2002 and 2006 Plaintiff had not followed up with any doctors for his diabetes. Plaintiff's claim that he did not follow up due to his lack of insurance fails because, when he did return to the Center in 2006, he still had no insurance and was nevertheless treated and given insulin for his hyperglycemia. Dkt. No. 10-8 at 60. Plaintiff, therefore, was well aware of the availability of medical help despite his insurance status.[4] While at

---

[4] Plaintiff also never reported to any of his physicians that the reason for his failure to follow up with specialists and maintain proper health care was lack of insurance. Dr. Zygmont noted, for instance, that Plaintiff simply stopped taking one of his medications and lost his glucometer. Dkt. No. 10-8 at 12.

the Center, he was also instructed to follow up with a diabetes educator in one month, and return to the clinic in four months, but no record exists indicating that Plaintiff ever did so.  Id. at 61.

Although the ALJ did not ask Plaintiff why he failed to take medications or keep appointments, he correctly concluded that the record lacks support for Plaintiff's argument that he had no access to medical care because of a lack of insurance.  Rather, substantial evidence supports the ALJ's opinion that Plaintiff "could have received medical care, [but] failed to make use of it," and that he did not seek long-term care for almost a decade.  Dkt. No. 10-2 at 25.  Moreover, an ALJ's failure to expressly consider every credibility factor is not grounds for remand, so long as the ALJ gives reasons that are "sufficiently specific to conclude that he considered the entire evidentiary record in arriving at his determination."  Wischoff v. Astrue, No. 08-CV-6367, 2010 WL 1543849, at *7 (W.D.N.Y. Apr. 16, 2010); see also Cichocki v. Astrue, No. ll-CV-755S, 2012 WL 3096428, at *8 (W.D.N.Y. July 30, 2012).

Plaintiff further argues that the ALJ's credibility assessment was improperly performed because the ALJ first determined Plaintiff's overall RFC and then used that RFC to discount Plaintiff's non-conforming allegations and resulting limitations.  Pl. Br. at 22.  The Court disagrees.  In his analysis, the ALJ carefully explained how Plaintiff's alleged limitations are not supported by substantial evidence.  Dkt. No 10-2 at 23-24.  There is no basis to invalidate the ALJ's findings because he explained his "decision explicitly and with sufficient specificity that a reviewing court [can] decide whether there are legitimate reasons for the ALJ's disbelief and whether his decision is supported by substantial evidence."  See Urena-Perez v. Astrue, No. 06 CIV. 2589, 2009 WL 1726217, at *40 (S.D.N.Y. Jan. 6, 2009), report and recommendation adopted as modified, No. 06 CIV. 2589, 2009 WL 1726212, at *1 (S.D.N.Y. June 18, 2009).

### C. Step Five Determination

If a claimant has the capacity to work, step five requires the examiner to determine whether a significant number of jobs exist in the national economy that the claimant may perform. 20 C.F.R. § 416.965. Plaintiff argues that "the ALJ's errors in determining the RFC and determining Plaintiff's credibility render the Step 5 decision unsupported by substantial evidence," and warrant remand. Pl. Br. at 23.

The ALJ found that Plaintiff is a young individual with a limited education who is able to communicate in English. Dkt. No. 10-2 at 25. The ALJ also found that the transferability of skills was not an issue because Plaintiff's past relevant work was unskilled, and that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. Id. These factual findings, in conjunction with Plaintiff's RFC for a range of light work, correspond to medical-vocational Rule 202.17. 20 C.F.R. Part 404, Subpart P, Appendix 2. Therefore, the ALJ did not err in his RFC and credibility determinations, and there is no basis to disturb the ALJ's Step 5 determination.

## V.      CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that the Commissioner's decision is **AFFIRMED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties.

**IT IS SO ORDERED.**

DATED:      September 02, 2014
              Albany, New York

_____
Lawrence E. Kahn
U.S. District Judge